UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

Dina Galloway,                                    :        Case No. 1:11-cv-556
                                                  :
        Plaintiff,                                :
                                                  :
vs.                                               :
                                                  :
Commissioner of Social Security,                  :
                                                  :
        Defendant.                                :


## ORDER

Before the Court are Plaintiff's objections to the Magistrate Judge's Report and

Recommendation.  (Doc. 17)   The Magistrate Judge has recommended that this Court

affirm the decision of the Commissioner, denying Plaintiff's application for disability

benefits.  For the following reasons, the Court overrules the Plaintiff's objections.

## FACTUAL BACKGROUND

Galloway filed an application for benefits in November 2007, claiming on onset

date of June 30, 2006.  After her claim was administratively denied, she requested a

hearing.  The ALJ conducted an evidentiary hearing in May 2010, and subsequently

issued a written decision denying her application.  (TR 7-31)

The ALJ reviewed at length the evidence in the record concerning Galloway's

impairments.  Galloway was diagnosed with sickle cell trait, and was hospitalized in the

mid-1990's.  Dr. Rudolph, a treating hematologist, noted that she had refused

transfusion therapy at that time, and then developed hematuria and rhabdomyolysis that

resulted in hospitalization and a period of rehabilitation.  Galloway saw Rudolph in July

2005, complaining of left flank pain.  Rudolph ordered a CT scan and an MRI.  Because her sickle cell crises were not frequent, Rudolph did not start Hydrea therapy but told her to take folic acid daily.  (TR 454)  By December 2005, Galloway admitted that she was not doing so, but told Rudolph that her left flank pain was "bearable."  She refused pain medication, but admitted that she occasionally took one of her mother's Darvocets. (TR 458)

In December 2007, Dr. Rudolph completed a questionnaire for Galloway's disability application, stating that she did not have any sickle cell crises or episodes of severe pain, and no documented period of prolonged anemia.  He did not believe that she needed anything more than conservative treatment.  In February 2008, her blood counts were stable, and she was only slightly anemic in June 2008.

Dr. Gelman, her primary care doctor for several years, referred Galloway to a gastroenterology group (Dr. Fry and Dr. Saeed) in October 2003.  (TR 927)   She was complaining at that time of abdominal pain and discomfort, and a previous colonoscopy apparently suggested irritable bowel syndrome.  She did not return again until late 2007, complaining of left lower quadrant pain; clinical tests at that time revealed nothing abnormal and biopsies were negative.  (TR 918)  She saw Dr. Fry again in March 2010 for similar problems, and he noted that there had not been any major changes since the 2003 evaluation.  He also noted that Galloway had been without a primary care provider for some time, and that she "has not been very good with following up with providers. She states that she gets a vibe from them that they are not taking her seriously and then does not go back."  (TR 909)

The ALJ also reviewed Galloway's treatment for back and leg pain.  In March

2005, she reported to Dr. Gelman that her pain got worse with "long sitting, walking, or standing." (TR 477)  On March 17, 2007, she went to the emergency room complaining of bilateral leg weakness and pain, but on examination no definitive weakness was found.  Galloway was discharged and reported to be walking well, and her test results were described by the physician as  "reassuring."  Dr. Gelman requested that she not be given narcotics.  (TR 377)   She saw Dr. Gelman on March 19, still complaining of pain in her buttocks, lower back and legs.  She had a lumbar MRI on March 21, 2007, which disclosed a diffuse disc bulge at L5-S1 with some disc protrusion and affect on the left L5 nerve root.

Galloway was admitted to the hospital on April 17 by Dr. Gelman, for continuing complaints of right leg pain.  Dr. McDonough saw her in the hospital, and reported that Galloway had described this as a recurrent problem since 1997 (around the time she was hospitalized for the sickle cell flare-up).  Galloway also told McDonough that the recent lumbar MRI was normal.  Dr. McDonough's physical examination documented decreased sensation in the L5 distribution on the right leg and some weakness on the right side, but straight leg raise was negative for radicular pain.  Galloway was able to walk but favored her right leg.  McDonough's impression was a subacute right L5 radiculopathy, and she referred Galloway for physical therapy to improve mobilization. (TR 424)   Dr. Gelman continued to see Galloway until December 2007; but other than the visits on March 19 and May 4, where he noted that Galloway was hypersensitive to touch in her lower back and leg, his neurological and extremity exams were consistently within normal limits, with good to full range of motion and normal, even pulses.  (TR 464-479)

Galloway went to the emergency room in October 2009, complaining of non-radiating back pain.  The examination note states that she was able to move all of her extremities without difficulty, and her gait and motor status were not affected.  She was diagnosed with a back strain and referred for physical therapy. (TR 582, 586-587)

Galloway had a documented weight loss during late 2006-2007 of approximately 30 pounds.  Dr. Rudolph noted that her weight was 152 on December 2, 2005; in December 2006, she saw Dr. Gelman complaining of right lower abdominal pain, and she weighed 144 pounds.  By March 2007 she weighed 127 pounds when she again saw Dr. Gelman; the weight loss was suspected to be due to chronic diarrhea.  (TR 421)  The record does not contain any significant documentation of medical treatment during most of 2006 (although that was the year that she claims the onset of her disability, and being so sick and missing so much work that she was terminated from her job).  There are no records from Dr. Rudolph that year, and only two visits with Dr. Gelman, in May and December.  Neither of those visits with Gelman document any concern about severe weight loss.  By August 2008, her weight was back up to 165 pounds.  (TR 684, visit with Dr. Baggish)

Dr. Rudolph referred Galloway to the UC Allergy/Immunology Clinic in December 2007, for evaluation of her candida infections.  Dr. Bernstein reported to Dr. Rudolph that Galloway was asymptomatic when she was first seen, but she reported that the infections would regularly reoccur.  Bernstein planned to perform sensitivity testing and, if positive, to discuss candida immunotherapy.  She was later tested for candida sensitivity but her antigen responses were good.  Bernstein also told Rudolph that Galloway's IgM deficiency might predispose her to candida infections, and he planned

-4-

to perform various immune system tests.  (TR 840)  Those tests were performed and the results were "essentially normal."  (TR 633)  Galloway continued to see Bernstein and visited the clinic from late 2007 through 2009; her low IgM was repeatedly noted, which was of concern. And on July 16, 2009, Bernstein urged her to consider candida desensitization therapy, as he reported to Dr. Rudolph in January 2008 that his clinic had achieved good success with that therapy. (TR 839)   There is no indication in the record that Galloway has pursued desensitization therapy as recommended.  Galloway discontinued treatment with Dr. Rudolph in October 2008, calling to cancel an appointment and saying that she was "tired of going to doctors, still having problems and nothing helping."  (TR 833)

Galloway was also treated by Dr. Baggish, at the Good Samaritan Women's Center beginning in August 2008, for her complaints of infections, vulvar itching, burning, discharge and odor.  Dr. Baggish started her on a "clean up routine" and treated her for a fungal infection, which by October had improved her symptoms.  (TR 683-685)  She went back to Baggish in April 29, 2009, complaining of some irritation, and he instructed her on using Peroxide swabs and cultured her for fungus.  On September 18, he reported that all cultures were negative, and noted that her symptoms were possibly characteristic of pudendel neuralgia.  He then referred her for treatment at  the Center for Pelvic Floor and Core Rehabilitation.  At her initial evaluation on October 28, Galloway was placed on a plan of therapy and exercises, once a week for two months, to improve her functioning.  The therapist noted that she was in need of social and/or vocational services, but Galloway refused the offer because she "had too many things going on." (TR 664)  By December 16, 2009, her therapist reported a poor

level of compliance after six visits, noting that Galloway said that she was "disgusted by the biofeedback, and refused further biofeedback due to the emotional distress she experiences."  (TR 669)  The biofeedback treatment is described as the standard treatment protocol for this type of neuralgia syndrome.

Galloway also saw a neurologist, Dr. Zadikoff at Riverhills, for several visits in 2009 and 2010.  On September 1, 2009, she saw Zadikoff for evaluation of pain in her feet.  Her examination was normal, including equal strength on both sides, normal muscle tone and stretch reflexes, and no sensory deficits or loss.  Zadikoff suspected neuropathy, and also sent her for testing to rule out celiac disease, based on her history of intermittent diarrhea.  (TR 659)  She saw Zadikoff again in April 2010, complaining of numbness and tingling in her hands and arms.  An MRI of her brain was essentially unremarkable, and her neurological examination was normal, with normal strength in all extremities, normal posture and coordination, reflexes and sensation intact, and her gait only minimally unsteady.  (TR 932-933)

Dr. Miller (a podiatrist)  treated Galloway beginning in November 2008, and continuing through 2010 for foot pain.  Dr. Miller referred Galloway to physical therapy in February 2010, but it was discontinued after eight sessions because Galloway showed no significant progress and her performance on exercises was inconsistent.  (TR 939) He also prescribed orthotics for her in 2009; she reported they were uncomfortable and she was told to bring them in for adjustments at her next appointment.  But the next mention of orthotics is not until May 2010 visit, when she was again told to bring them

for adjustment.[1]

In addressing the steps of the sequential analysis required to determine disability, the ALJ found that Galloway has severe impairments of sickle cell trait; pain disorder; irritable bowel syndrome; hematuria; degenerative disc disease; rhabdomyolysis; diffuse myalgia and arthrolgia; fibromyalgia; IgM deficiency resulting in recurrent candida infections; depression; and somatoform disorder.  He found that Galloway's impairments, either singly or in combination, do not meet or equal a listed impairment.  The ALJ then formulated Galloway's residual functional capacity: she can lift no more than fifty pounds occasionally and no more than 25 pounds frequently; push or pull no more than 25 pounds using hand or foot controls; sit, stand, and walk approximately six hours each in an eight hour workday; occasionally crawl and use ladders, ropes, or scaffolds; frequently kneel, crouch, and use ramps or stairs; she can understand, remember, and carry out no more than simple one and two step tasks where there are no high production demands; and she can have no more than superficial contact with the public, coworkers, and supervisors.  (TR 18)  Based upon the vocational expert's testimony at the hearing, the ALJ found that there are sufficient jobs available that Galloway can perform within those functional restrictions, and concluded that she is not disabled.

Galloway sought review of the ALJ's decision by the Appeals Council, which

---

[1] Dr. Miller also completed an assessment of Galloway's functional capabilities in October 2009, in which he opined that she was essentially incapacitated.  The ALJ rejected Miller's opinion because it was inconsistent with the objective evidence. Galloway admits that these restrictions are "exaggerated," and she does not rely on Miller's assessment in this proceeding.  See Doc. 11, p. 24 at n.4.

rejected her request and found no reason to disturb the ALJ's decision.  (TR 1)
Galloway timely sought judicial review of the Commissioner's final decision by filing her
complaint in this Court.  (Doc. 1)

## ANALYSIS

Standard of Review

Under 42 U.S.C. § 405(g), this Court reviews the Commissioner's final decision
by determining whether the record as a whole contains substantial evidence to support
that decision.  "Substantial evidence means more than a mere scintilla of evidence,
such as evidence a reasonable mind might accept as adequate to support a
conclusion."  LeMaster v. Secretary of Health and Human Serv., 802 F.2d 839, 840 (6th
Cir. 1986) (internal citation omitted).  The evidence must do more than create a
suspicion of the existence of the fact to be established.  Rather, the evidence must be
enough to withstand a motion for a directed verdict when the conclusion sought to be
drawn from that evidence is one of fact for the jury.  Id.

If the ALJ's decision is supported by substantial evidence, the Court must affirm
that decision even if it would have arrived at a different conclusion based on the same
evidence.  Elkins v. Secretary of Health and Human Serv., 658 F.2d 437, 438 (6th Cir.
1981).  The substantial-evidence standard "... presupposes that there is a zone of
choice within which the decisionmakers can go either way, without interference by the
courts.  An administrative decision is not subject to reversal merely because substantial
evidence would have supported an opposite decision."  Mullen v. Bowen, 800 F.2d 535,
545 (6th Cir. 1986) (quoting Baker v. Heckler, 730 F.2d 1147, 1150 (8th Cir. 1984)).

The district court reviews de novo a Magistrate Judge's report and

recommendation regarding Social Security benefits claims.  <u>Ivy v. Secretary of Health & Human Serv.</u>, 976 F.2d 288, 289-90 (6th Cir. 1992).

<u>Galloway's Specific Objections</u>

In her statement of specific errors on appeal (Doc.11), Galloway raised three errors:  (1) the ALJ erred in finding that her immunoglobulin (IgA and IgM) deficiencies do not meet the requirements of Listing 14.07(C);  (2) the ALJ improperly weighed the medical opinion evidence; and  (3) the ALJ erred when he discounted Galloway's credibility concerning her subjective complaints.  The Magistrate Judge's Report thoroughly reviewed the record with respect to each of these claimed errors, and concluded that they lacked merit.  Galloway objects to the Magistrate Judge's findings and recommendations with respect to each claimed error, discussed in turn below.

(1) <u>Listing 14.07(C)</u>

The Social Security Regulations provide that if a claimant's impairment or combination of impairments meets or medically equals the criteria of a listed impairment, the claimant is deemed disabled.  Listing 14.00 generally covers immune system disorders.  Galloway contends that her impairments meet or medically equal Listing 14.07(C), immune deficiency disorders (other than HIV infection).  This subsection requires a documented immune deficiency, as well as a condition that meets the provisions of Subsection 14.07(C):

> C.  **Repeated** manifestations of an immune deficiency disorder, with at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss) and one of the following at the **marked** level:
>
> > 1. Limitation of activities of daily living.

> 2. Limitation in maintaining social function.
>
> 3. Limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.

20 C.F.R. Part 404, Subpart P, App. 1, §14.07(C)(emphasis added).

The pertinent regulations for this Listing define "repeated" manifestations as occurring "... on an average of three times a year, or once every 4 months, each lasting 2 weeks or more; or the manifestations do not last for 2 weeks but occur substantially more frequently than three times in a year or once every 4 months; or they occur less frequently than an average of three times a year or once every 4 months but last substantially longer than 2 weeks." Listing 14.00(I). A "marked" limitation is also specifically defined for purposes of this listing:

> 4. To satisfy the functional criterion in a listing, your immune system disorder must result in a "marked" level of limitation in one of three general areas of functioning: Activities of daily living, social functioning, or difficulties in completing tasks due to deficiencies in concentration, persistence, or pace. Functional limitation may result from the impact of the disease process itself on your mental functioning, physical functioning, or both your mental and physical functioning. This could result from persistent or intermittent symptoms, such as depression, severe fatigue, or pain, resulting in a limitation of your ability to do a task, to concentrate, to persevere at a task, or to perform the task at an acceptable rate of speed.
>
> 5. When "marked" is used as a standard for measuring the degree of functional limitation, it means more than moderate but less than extreme. We do not define "marked" by a specific number of different activities of daily living in which your functioning is impaired, different behaviors in which your social functioning is impaired, or tasks that you are able to complete, but by the nature and overall degree of interference with your functioning. You may have a marked limitation when several activities or functions are impaired, or even when only one is impaired. Also, you need not be totally precluded from performing an activity to have a marked limitation, as long as the degree of limitation seriously interferes with your ability to function independently, appropriately, and effectively. The term

"marked" does not imply that you must be confined to bed, hospitalized, or in a nursing home.

6.   Activities of daily living include, but are not limited to, such activities as doing household chores, grooming and hygiene, using a post office, taking public transportation, or paying bills.  We will find that you have a "marked" limitation of activities of daily living if you have a serious limitation in your ability to maintain a household or take public transportation because of symptoms, such as pain, severe fatigue, anxiety, or difficulty concentrating, caused by your immune system disorder (including manifestations of the disorder) or its treatment, even if you are able to perform some self-care activities.

7.   Social functioning includes the capacity to interact independently, appropriately, effectively, and on a sustained basis with others. It includes the ability to communicate effectively with others.  We will find that you have a "marked" limitation in maintaining social functioning if you have a serious limitation in social interaction on a sustained basis because of symptoms, such as pain, severe fatigue, anxiety, or difficulty concentrating, or a pattern of exacerbation and remission, caused by your immune system disorder (including manifestations of the disorder) or its treatment, even if you are able to communicate with close friends or relatives.

8.   Completing tasks in a timely manner involves the ability to sustain concentration, persistence, or pace to permit timely completion of tasks commonly found in work settings.  We will find that you have a "marked" limitation in completing tasks if you have a serious limitation in your ability to sustain concentration or pace adequate to complete work-related tasks because of symptoms, such as pain, severe fatigue, anxiety, or difficulty concentrating, caused by your immune system disorder (including manifestations of the disorder) or its treatment, even if you are able to do some routine activities of daily living.

Thus, in order to meet or equal Listing 14.07(C), Galloway must demonstrate that she has had repeated manifestations of at least two of the typical immune deficiency disorder symptoms (severe fatigue, fever, malaise, or involuntary weight loss) AND at least one "marked" limitation in an area of functioning.

The ALJ assumed, without specifically concluding, that Galloway could satisfy the "repeated manifestation" part of the Listing.  But he concluded that she did not show a

"marked" limitation in any of the areas of functioning.  Galloway claimed marked

limitations in social functioning, arguing that her frequent periods of infection, abdominal

pain and diarrhea would also result in marked limitations in activities of daily living, and

in concentration, persistence, or pace.   The ALJ rejected her argument, finding that the

"objective evidence of record does not support findings of marked limitations in activities

of daily living, social functioning, or concentration, persistence, or pace.  The weight of

the claimant's argument is based upon her subjective complaints and not objective

signs and findings."  (TR 18)

        In her statement of errors, Galloway cited what she described as "objective

evidence" that the ALJ overlooked.  The Magistrate Judge rejected this argument

because the "objective" evidence she cited consisted of her own subjective reports to

various providers or disability reviewers, her own hearing testimony, and her mother's

report of functioning.  The Magistrate Judge did note that a psychiatrist (Dr. Rohs) who

visited Galloway when she was admitted to the hospital in April 2007, described her as

"tearful" and that her "mood looks depressed and a corresponding affect."  (TR 421)

But Dr. Rohs reported that Galloway was not interested in antidepressants, "because

she believes her mood would be better if she had a more certain medical diagnosis ...",

and all he could do was allow her to ventilate and provide some reassurance.   (TR 420-

421)

        Galloway relies on the conclusions of Dr. Leisgang, a psychologist who examined

her on October 2, 2007 in connection with her disability application. Dr. Leisgang

assessed Galloway's mental status and level of intellectual functioning.  Galloway's full

scale IQ on the Wechsler test was 67, and her scores on other cognitive tests were

below average.  Dr. Leisgang assigned a GAF score of 45, and diagnosed major depressive disorder and panic disorder.  She ultimately opined that Galloway's mental ability to relate to others; to understand, remember, and follow simple instructions; and to maintain attention, concentration, persistence, and pace were all moderately impaired.  Leisgang also opined that Galloway's mental ability to withstand the stress and pressure of day-to-day work activity is "moderately to seriously" impaired.  (TR 436)

The Magistrate Judge found that Dr. Leisgang's findings of a "moderate to serious" limitation in her ability to withstand daily work stressors was properly discounted by the ALJ.  As discussed more fully below with respect to the ALJ's consideration of the medical opinions, Dr. Schwartz testified at the hearing that he found Galloway to have moderate limitations in all relevant areas.  He noted that there is no evidence of psychiatric or psychological treatment that might support a "marked" limitation in ability to handle daily work stresses.  Ultimately, the Magistrate Judge concluded that the ALJ had thoroughly reviewed the record and that substantial evidence supported his decision that Galloway does not meet or equal Listing 14.07(C).

Galloway objects, arguing that the Listing pertains to a physical impairment, and any analysis should address her physical limitations.  She argues that the Magistrate Judge incorrectly focused on her psychological limitations, and failed to discuss her frequent infections and chronic diarrhea, and severe fatigue that resulted from those bouts.  The Court rejects this argument.  The Magistrate Judge specifically noted that Dr. Wunder expressed no opinion that these reported physical symptoms created any limitations in the three functional areas (daily living, social functioning, or maintaining

-13-

concentration, persistence, or pace), or that she would miss inordinate amounts of work.

Dr. Wunder's physical examination observations were largely unremarkable, save for

weakness in her right leg.  And there is no medical opinion from any physician that

Galloway has a "marked" limitation in social functioning; indeed, Galloway does not

deny that she told Dr. Leisgang that she regularly leaves home and visits with friends,

with whom she had daily contact.

As there is substantial evidence in the record to support the Commissioner's

decision with respect to Listing 14.07(C), Galloway's objections are overruled.

    2.  <u>Error in Weighing Medical Opinions</u>

Galloway's second claimed error is that the ALJ failed to give controlling weight

to the opinions of her treating/examining physicians, and instead credited the opinions

of records reviewers and the testifying medical expert.  Galloway relies on the

evaluations performed by Dr. Leisgang and Dr. Wunder, who both examined her in

connection with her disability application.

As noted above, Dr. Leisgang ultimately concluded that Galloway had moderate

limitations in her ability to relate to others, to understand and follow simple instructions,

and her ability to maintain attention, concentration, persistence and pace.  She also

opined that Galloway's ability to withstand the stress and pressure associated with daily

work is "moderately to seriously impaired," and might result in increased anxiety or

panic attacks.  Dr. Wunder also examined Galloway in connection with her disability

application on October 10, 2007, for her "chief complaint of a chronic pain disorder."

(TR 437)  On examination, her gait pattern was not antalgic, and tandem walking was

diminished due to her complaints of right leg weakness.  She complained of pain while

standing on heels and toes, and also with squatting and rising.  Lumbar flexion was through 60 degrees, her reflexes were symmetric, and sensation was normal.  There was some weakness in her right motor strength, and straight leg raise on the right resulted in anterior thigh pain.  Range of motion in her joints was normal, and her power grasp was 40 pounds on the right, and between 45 and 50 on the left.  Dr. Wunder concluded that with her documented rhabdomyolysis[2], Galloway has "residual weakness in the right leg.  Her functional capacities would allow only sedentary types of occupations.  I do not believe she could squat, kneel or crawl.  I do not believe she could repetitively bend at the waist."  (TR 440)

The ALJ gave Dr. Wunder's conclusions little weight, finding that the objective medical evidence, including Dr. Wunder's own exam findings, supported more than a sedentary functional capacity.  The ALJ gave greater weight to the opinion of Dr. Jon Starr, a non-examining reviewer who completed a physical RFC assessment on February 5, 2008.  Dr. Starr found that Galloway's allegations were not supported to the degree she claimed, and that her subjective descriptions of the severity of her symptoms were only partially credible.  He opined that she could occasionally climb ladders, ropes or scaffolds, and occasionally crawl, but that she could frequently climb stairs, kneel and crouch.  (TR 520-525)

With respect to Galloway's mental functioning, the ALJ accorded greater weight

_____

[2] Rhabdomyolysis is the breakdown of muscle fibers, leading to the release of a protein called myoglobin into the bloodstream, where it is filtered out by the kidneys. This can cause damage to kidney cells.  Risk factors include vigorous exercise, crush injuries, genetic muscle diseases, or trauma.  See A.D.A.M. Medical Encyclopedia, www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001505, last accessed March 18, 2013.

to the opinion of Dr. Karla Voyten, who conducted a non-examining mental RFC assessment in January 2008.  Dr. Voyten concluded that Galloway was capable of understanding and remembering very short and simple instructions, and could maintain regular attendance and an ordinary routine.  She could make simple work-related decisions, but she was moderately limited in her ability to work with others, to maintain attention and concentration for extended periods, and to understand and remember detailed instructions.  She also found moderate limitations in Galloway's ability to interact with the public, to respond appropriately to criticism from supervisors, and to respond to changes at work.  Dr. Voyten credited Dr. Leisgang's observations of Galloway's behavior and ability to interact during Leisgang's examination, but noted that while Galloway reported spending most of her time in bed, she also said she leaves home regularly to visit friends and her husband.  And Galloway has no history of mental health treatment, observations which led Voyten to reject a "moderate to serious" impairment in stress tolerance.  Voyten found that Galloway was capable of "performing at least simple one and two step tasks where she does not have to meet high production demands with superficial social interaction."  (TR 503)  She concluded that Galloway had moderate limitations in all three functional areas (daily living activities, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace).  (TR 501-503)

The ALJ also accorded greater weight to the testimony of Dr. Schwartz, a psychologist who conducted a complete records review prior to the May 2010 hearing. Dr. Schwartz noted Leisgang's diagnosis of major depression and a GAF of 45, but that there were no psychological treatment records that would support that diagnosis.

Based on his review of all of the medical evidence, he agreed with Voyten's opinion of moderate limitations in function, and that Galloway should not have any high production demands and only superficial social interaction in the work setting.  (TR 52-53) The ALJ's assessment of Galloway's residual functional capacity incorporated Voyten's limitations.

The Magistrate Judge discussed the ALJ's treatment of the medical opinions in the context of the applicable regulations.  Treating source opinions are generally accorded the most weight.  The only treating source opinion in the record comes from Dr. Miller, and Galloway admits that his opinion is not entitled to any weight.  The rest of the opinions come from nontreating sources Leisgang and Wunder, and nonexamining sources Voyten, Starr, and the testifying expert Dr. Schwartz.  With regard to all nontreating sources, the regulations provide that examining sources will generally be given more weight than nonexamining sources, but they are not given  controlling weight.  20 C.F.R. §§ 404.1527(C)(3)-(6) identifies factors relevant to determining the weight afforded to any nontreating source: the extent to which the opinion is supported by relevant evidence, particularly by medical signs and laboratory findings, and the degree to which the source explains the opinion in light of that evidence; the extent to which the opinion is consistent with the record as a whole; the specialization of the source; and any other factors which tend to support or contradict the opinion, such as familiarity with the entire case record.

The Magistrate Judge found that the ALJ adequately discussed the evidence supporting his RFC assessment.  The ALJ accorded greater weight to Dr. Schwartz's hearing testimony, which was based upon his review of Galloway's entire medical

record, while Dr. Leisgang's opinion was based in large part upon Galloway's subjective descriptions of her limitations.  And while the ALJ did not list the medical evidence that supported Dr. Schwartz's testimony when he specifically addressed Schwartz's  opinion, the ALJ's decision as a whole reviewed in detail the history of Galloway's complaints, treatments, and clinical testing.  The Court agrees with the Magistrate Judge's conclusion that when viewed in its entirety, the ALJ's decision adequately explains the basis for the weight he gave to the various medical source opinions regarding Galloway's mental functioning.  Moreover, it is clear that Voyten and Leisgang largely agree that Galloway has moderate limitations in functioning.  They agree that Galloway would have no difficulty understanding or retaining simple instructions.  They both found moderate limitations in her ability to complete a normal workday or week, and to maintain a consistent pace.  Where they slightly differed is Leisgang's "moderate to serious" limitation in her ability to withstand daily work stresses, while Voyten found moderate limits on Galloway's ability to respond to changes or accept criticism from supervisors (potential sources of workplace stress).  But Leisgang qualified her opinion on this subject, saying that stress "may" cause panic attacks or "may" increase anxiety and thereby decrease Galloway's concentration and attention.  The Court agrees with the Magistrate Judge that the entirety of Galloway's history is more consistent with Voyten's opinion.

The same conclusion applies to the physical limitations incorporated into the ALJ's residual functional assessment.  The ALJ found that Dr. Wunder's objective findings from his own examination did not support his sedentary work limitation.  While Wunder noted that Galloway had a documented history of rhabdomyolysis and some

residual weakness in her right leg, he did not address the fact that he tested her right leg strength as 4/5, and had normal findings for her left leg.  These observations do not support a sedentary work restriction.[3]  In addition, the ALJ cited the evidence of the examinations in the emergency room records, where Galloway complained of leg weakness yet her clinical examinations showed her able to walk with little or no definitive weakness.  The ALJ cited Dr. Zadikoff's September 2009 neurology exam, in which Galloway's strength, her gait, muscle tone and reflexes were all equal and normal.  The same observations were made in January 2010, well after Dr. Wunder's examination and after the April 2009 MRI of her foot.

The Magistrate Judge concluded that the ALJ's treatment of the conflicting opinions of Dr. Starr and Dr. Wunder was substantially supported by the record as a whole: "While the record could conceivably support a contrary finding, the Social Security Act does not permit the reviewing court to resolve conflicts in the evidence. ... The Court's review is limited to determining whether substantial evidence supports the ALJ's conclusion.  Here, the ALJ complied with the regulations for evaluating opinion evidence and his determination to give 'little weight' to Dr. Wunder's opinion is substantially supported."  (Doc. 16 at 21; internal citation omitted)

Galloway objects, arguing that Dr. Wunder's opinion is supported by objective

---

[3] The evidence of rhabdomyolysis is contained in the notes of Dr. Rudolph from a July 2005 visit, where Rudolph states that in 1997, Galloway was hospitalized for hematuria (blood in her urine) and developed rhabdomyolysis and extremity weakness at that time.  She had no further incidence of hematuria until June-July 2005, when Dr. Pliskin apparently advised her to pursue transfusion therapy and she refused.  The hematuria spontaneously resolved just before her visit with Dr. Rudolph.   The only clinically significant finding noted by Rudolph in 2005 was a left ovarian cyst.  (TR 456)

evidence of the MRIs of her feet.  She contends that the Magistrate Judge's conclusion is "pure supposition," and that she inappropriately put herself in the role of a physician. (Doc. 17 at 2)  Galloway's objections are not well-taken.  Neither the ALJ nor the Magistrate Judge assumed the role of a physician in their respective reviews of the evidence in the record or in reaching their conclusions.  The ALJ accorded greater weight to Voyten's opinion that Galloway had a moderate limitation in her ability to withstand work pressures, and to Starr's opinion that she was capable of restricted medium work, because those opinions were supported by the record as a whole.  Soc. Sec. Pub. 96-6p addresses the consideration of state agency medical expert opinions and specifically notes that in appropriate circumstances, such opinions may be given greater weight than the opinions of both treating and examining medical sources.  It cites as an example when a consultant has reviewed the complete case record, including a specialist's report that provides more detailed and comprehensive information than what was available to the treating source at the time the opinion was rendered.  If this is true regarding a **treating** physician, then clearly a one-time examining but nontreating opinion can also give way to a nonexamining consultant's evaluation of the entire record.  That was the situation here, as Dr. Schwartz was able to review the complete medical record up to the May 2010 hearing, while both Leisgang and Wunder based their opinions upon a one-time examination and Galloway's subjective reports.

This Court agrees with the Magistrate Judge that, while the record could support a contrary conclusion or greater restrictions on her physical functioning, it is the Commissioner's responsibility to resolve conflicts and contradictions in the record, not

the Court's.  Because substantial evidence supports the ALJ's consideration and treatment of the medical source opinions, this Court agrees with the Magistrate Judge's conclusion.  Galloway's objections on this ground are overruled.

       3.  <u>Error in Evaluating Galloway's Credibility</u>

       Galloway objects to the ALJ's evaluation of her credibility in reporting her symptoms and limitations.  The ALJ summarized Galloway's descriptions of her symptoms, and found that her statements "concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent" with the ALJ's residual functional capacity assessment.  (TR 19)  The ALJ noted that a claimant's statements about the intensity and persistence of symptoms will not be rejected solely because objective evidence fails to substantiate those complaints.  However, he noted that there was no substantive evidence of adverse side effects from any of Galloway's treatment, and that her descriptions of daily living were inconsistent with her complaints.  She has received conservative care, and in many instances she did not comply or failed to follow up with various medical providers.  Her overall functioning reflected in the record was significantly better than she described at the May 2010 hearing, where she complained of severe diarrhea almost every day, and constant yeast and sinus infections that prevented her from leaving the house.  She said that she cannot sleep due to constant pain, and cannot do any household chores.  She also claimed that her past foot treatments did not help at all, and she had constant pain and tingling.  The ALJ concluded that her allegations are "disproportionate and less than credible."  (TR 22)

       In evaluating a claimant's reported symptoms from a medical impairment, the

ALJ must consider a claimant's credibility in order to evaluate the subjective complaints in light of the objective medical data.  20 C.F.R. § 416.929(a) provides that, once the claimant establishes a medical condition, the ALJ must consider (1) whether objective medical evidence confirms the severity of the reported symptoms, or (2) whether the condition can reasonably be expected to produce those symptoms.  "Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence."  Walters v. Commissioner of Social Security, 127 F.3d 525, 531 (6th Cir. 1997).  The ALJ's assessment, if properly explained and supported by substantial evidence, is entitled to deference from this Court.  If the ALJ finds a claimant's testimony is less than credible, the reasons supporting that finding must be clearly stated.  Felisky v. Bowen, 35 F.3d 1027, 1036 (6th Cir. 1994).  The regulations identify factors used to assess credibility; these include daily activities; the duration, frequency, and intensity of pain; the effectiveness of medication; the treatment received; and any other factors concerning the individual's functional limitations due to pain.  20 C.F.R. §404.1529(c).  Soc. Sec. Pub. 96-7p counsels that consistency in a claimant's statements is a "strong indication" of the claimant's credibility: "The finding on the credibility of the individual's statements cannot be based on an intangible or intuitive notion about an individual's credibility.  The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision."  Soc. Sec. Pub. 96-7p, 1996 SSR LEXIS 4 at *11.

In discounting Galloway's credibility, the ALJ cited the inconsistent reports about her daily functioning.  For instance, she reported in December 2007 that she tried to leave home every day, but in March 2008, she reported that she does not leave her

-22-

house except to go to the doctor.  She told Dr. Leisgang in October 2007 that she regularly goes out to visit with friends and with her husband.  Galloway reported to Dr. Wunder on October 10, 2007 that she was able to take care of her personal hygiene and daily living activities, but on October 14, Galloway's mother described her as essentially nonfunctioning .  (TR 237)   During a September 18, 2008 visit to the UC clinic, she reported pain at level 7 (out of 10), yet stated that she did not take any medication and that the pain did not interfere with her daily activities.  (TR 650)  The ALJ cited Galloway's April 2007 statement that her depression was primarily related to her medical problems, and her October 2007 report to Dr. Gelman that she was depressed because of family and marital problems.  (See TR 15)   Dr. Fry (Ohio GI and Liver Institute) suspected that Galloway's symptoms may be a manifestation of a somatization disorder, but Galloway rejected the suggestion because she claimed to have symptoms even during "happy" events.  (TR 907)

The ALJ also cited instances where Galloway refused offered treatments or services, or failed to follow through with treatment suggestions.  He noted Galloway's statement to Dr. Gelman that she would not take pain medication, but admitted that she occasionally took her mother's Darvocet.  (TR 458) Her therapist at the Center for Pelvic Floor Disorders noted that she needed social and vocational services, but she refused them because she had "too many things going on."  (TR 644)  She did not follow through with candida desensitization therapy offered by the UC allergy clinic.  She did not wear orthotics prescribed for her by Dr. Miller, and when she complained they were uncomfortable she did not follow up on having them adjusted.  She refused to pursue biofeedback therapy even though it was a standard form of treatment for pudendal

neuralgia.  She stopped seeing Dr. Rudolph in October 2008 because she was "tired of going to doctors" and "nothing was helping." (TR 833).  And her physical therapists reported that she displayed inconsistent efforts in pursuing therapeutic exercises.  (TR 939)  Dr. Fry strongly recommended that Galloway find a psychiatrist to thoroughly address her depressive symptoms and somatization, but there is no evidence in the record that Galloway followed that recommendation.  Finally, the ALJ cited the many objective and clinical findings on physical and neurological examinations which were largely unremarkable, and which he found to be inconsistent with Galloway's subjective descriptions of her limitations.

The Magistrate Judge concluded that substantial evidence supports the ALJ's determination.  She did agree that the ALJ mistakenly asserted that "there is no imaging which shows an orthopedic condition that could reasonably be expected to produce pain of the frequency, severity, and duration that [Galloway] has described."  (See TR 22) The March 2007 lumbar MRI documented a disc bulge and protrusion on the left L5 nerve, and the subsequent MRIs of her feet documented Morton's neuroma[4] and arthropathy.  Even if the ALJ was mistaken about the lack of imaging studies, the Magistrate Judge noted that there is no medical opinion in the record that the conditions observed on the MRIs caused the severe functional limitations Galloway argues exist.

---

[4] Morton's neuroma is an "injury to the nerve between the toes, which causes thickening and pain.  It commonly affects the nerve that travels between the third and fourth toes."  Its exact cause is unknown, but abnormal toe positions, flat feet, hammer toes, high arches, and tight shoes and high heels may cause or contribute to the condition.  See www.ncbi.nlm.nih.gov/pubmedhealth/PMH0004542, last accessed March 14, 2013.  Galloway was given a series of alcohol injections to treat this condition.

-24-

Moreover, any error in this regard is harmless because the ALJ properly discussed the balance of the medical evidence that supports his credibility determination.

Galloway objects, repeating her argument that the ALJ was factually inaccurate in stating there was no imaging study.  She contends that the Magistrate Judge did not deny that, but instead focused on "minor" inconsistencies in Galloway's reporting (such as attributing different reasons to her depression at different times), and ignored the reality that any individual's daily living activities can "logically change over time."  But there were more than "minor" inconsistencies in Galloway's various reports over time of her functional capabilities.  And her argument overlooks the ALJ's reliance on the objective clinical testing results, as well as Galloway's history of lack of adherence to and follow-up with suggestions for treatments that could address or alleviate her symptoms.  The Court agrees with the Magistrate Judge's analysis on this issue, and overrules Galloway's objection.

## CONCLUSION

For all of the reasons discussed above, Plaintiff's objections to the Magistrate Judge's Report and Recommendation are overruled.  The Court adopts the Report and Recommendation in full.  The Court affirms the decision of the Commissioner that Plaintiff is not entitled to an award of disability benefits.

SO ORDERED.

THIS CASE IS CLOSED.

DATED: March 27, 2013                    s/Sandra S. Beckwith
                                         Sandra S. Beckwith
                                         Senior United States District Judge